ᴚECEIVED
ᴜ. WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE 3 / 25 / 14

UNITED STATES DISTRICT COURT                          b

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION


JUANITA MAE SMITH,              CIVIL ACTION
    Appellee                NO. 1:13-CV-00366

VERSUS

MICHAEL J. ASTRUE, COMMISSIONER     JUDGE DEE D. DRELL
OF SOCIAL SECURITY,                 MAGISTRATE JUDGE JAMES D. KIRK
    Appellants


REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Juanita Mae Smith ("Smith") filed an application for supplemental security income benefits ("SSI") on September 1, 2010, alleging a disability onset date of January 1, 2003 (Tr. p. 156) due to "degenerative disc disease/carpal tunnel disease/pinched nerve" (Tr. p. 183). That application was denied by the Social Security Administration (Tr. p. 116).

A de novo hearing was held before an Administrative Law Judge ("ALJ") on October 6, 2011, at which Smith appeared with her attorney and a vocational expert (T. p. 57). The ALJ found that, although Smith suffers from severe impairments of degenerative disc disease of the cervical and lumbar spine with cervical radiculopathy and carpal tunnel syndrome, arthritis in the left foot (status post healed left foot fracture), chronic obstructive pulmonary disease, hypertension, and depression (Tr. p. 16), she has the residual functional capacity to perform sedentary work except for work involving hazards such as dangerous moving

machinery, unprotected heights and concentrated exposure to gases, fumes, smoke and other pulmonary irritants, is limited to 1-2-3 step instructions with no production rate or pace work, and can have only occasional interaction with the public, co-workers and supervisors (Tr. pp. 19-20).  The ALJ concluded that Smith was not disabled within the meaning of the Social Security Act at any time through the date of his decision on January 6, 2012 (Tr. p. 24).

Smith requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 1), and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Smith next filed this appeal for judicial review of the Commissioner's final decision.  Smith raises the following issues for review on appeal (Doc. 15):

> 1. The ALJ declined to adopt the mental restrictions assessed by Dr. Spurrier, and she adopted a mental residual functional capacity which is not reflective of the assessment by Dr. Adams, the source on whom she intended to rely.  No evidentiary choices support the ALJ's finding; the mental residual functional capacity adopted by the ALJ is less restrictive than any of the mental health sources in the record.

> 2. The ALJ found that the claimant cannot resume her past work, and the burden to prove other jobs shifted to the Commissioner.  Since the assumptions which underpin the vocational expert testimony are unsupported, the Commissioner's burden to prove other jobs is unsatisfied.

> 3. Even if the hypothetical had been adequate, the vocational expert admitted that he did not know how many of the numbers of jobs cited were actually consistent with the ALJ's assumptions.

The Commissioner filed a brief in response (Doc. 16), to which Smith replied (Doc. 17).  Smith's appeal is now before the court

for disposition.

<u>Eligibility for SSI Benefits</u>

To qualify for SSI benefits, a claimant must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1381(a).  Eligibility is dependent upon disability, income, and other financial resources.  42 U.S.C. § 1382(a).  To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than 12 months.  Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy.  42 U.S.C. § 1382(a)(3).  The earliest month for which an eligible SSI claimant can receive benefits is the month following the month his application was filed, 20 C.F.R. § 416.335, or the month following the month during the pendency of the application that the claimant meets all the eligibility requirements, 20 C.F.R. § 416.330(a).

<u>Summary of Pertinent Facts</u>

Smith was 41 years old at the time of her 2011 administrative hearing, has a tenth grade education, and has past relevant work as a certified nurse assistant ("CNA") at a nursing home and working in housekeeping at a nursing home (Tr. pp. 161-165, 171).

### 1. Medical Records

In October 2003, an MRI of Smith's cervical spine showed some disc abnormalities at C4/5, C5/6 and C6/7, suggesting very small herniations or protrusions at C4/5 and C5/6 that may be slightly

3

more right-sided, and reversal of the normal lordotic curve at those levels (Tr. pp. 55-56). In January 2007, an MRI of Smith's cervical spine showed moderate degenerative disc disease at L2-3 with a posterior herniation contributing to an AP diameter spinal stenosis of about 8 mm, and minor bulging of the discs at other levels without focal herniation or protrusion (Tr. pp. 53-54). A cervical spine MRI in February 2008 showed posterior disc herniations at C4-5, C5-6 and C6-7 with borderline slightly worse change at C5-6, AP diameter spinal stenosis at C5-6 of 9 mm, and at C4-5 and C6-7 of 10 mm, and mild uncovertebral arthritic narrowing of the intervertebral foramina at several levels (Tr. pp. 51-52).

An MRI of Smith's lumbar spine in March 2009 showed decreased disc height with small broad-based disc herniation at L2-3, small, non-compressive posterior broad-based disc herniation at L3-4, posterior bulging of the annulus fibrosis at L4-5 and L5-6, and mild generalized facet arthritis from L2-3 through L5-S1 (Tr. pp. 50, 271-275).

In February 2009, Smith went to the emergency room for nonspecific chest pain (Tr. pp. 263-264). Smith was diagnosed with nonspecific chest pain associated with a cough, probably bronchitis, a history of hypertension, a history of hypercholesterolemia, and family history of coronary artery disease (Tr. p. 261). Smith was sent home on her regular medications including Prevacid, bisoprolol/HCT, Lipitor, and hydrocodone, and was prescribed Omnicef (Tr. p. 261).

Also in February 2009, Dr. Beau Brouillette, a family medicine doctor, examined Smith for left foot pain; she had a full range of motion at the ankle and some tenderness at the dorsal aspect, so he ordered x-rays (Tr. p. 343).   Dr. Brouillette also prescribed Lexapro for Smith's anxiety disorder, Nicoderm patches to help with smoking cessation, and continued her Lipitor (Tr. p. 343).

In March 2009, Smith was treated at the LSU Health Sciences Center emergency room for a painful fracture to her left foot (Tr. pp. 370-373).   Smith was diagnosed with a stress fracture and prescribed crutches and Lorcet (Tr. p. 373).

In May 2009, Smith was treated at the LSU Health Sciences Center for knee, leg and foot pain (Tr. pp. 366-369).   It was noted that Smith was 5'6" tall and weighed 215 pounds (Tr. p. 366). Smith was prescribed Toradol, Mobic and Flexeril (Tr. pp. 367-369).

Also in May 2009, Smith had a chronic fracture of her left foot  for which she had been wearing a boot about a month; her pain had decreased and an x-ray showed the fracture was healing well (Tr. pp. 280, 290).   In June 2009, Smith had a six month follow-up visit for her fractured left foot; she was still ambulating with a boot (Tr. p. 279) and x-rays showed an old appearing healing fracture through the base of the metatarsal of the little toe (Tr. p. 289).   In July 2009, Smith's left foot had tenderness on the left fifth metatarsal (Tr. pp. 278) and an x-ray showed a subacute appearing transverse healing fracture at the base of the proximal half of the metatarsal of the little toe (Tr. p. 288).   X-rays in September 2009 showed a subacute appearing transverse fracture

coursing through the base of the metatarsal of the little toe (Tr. p. 287).

In August 2009, Dr. Brouillette noted that Smith's EMG showed mild left mid-cervical radiculopathy and carpal tunnel syndrome, and she complained of back pain (Tr. p. 296). Dr. Brouillette continued Smith's medications and ordered a repeat MRI (Tr. p. 296). A cervical MRI in August 2009 showed small posterior disc herniations at C4-5, C5-6 and C6-7 with mild spinal stenosis, most prominent at C5-6 where there is a slight reversal of the normal lordotic curve, varying degrees of intervertebral foraminal narrowing, nothing greater than moderate, and new modic Type I changes at C5-6 likely related to some increase in the degenerative changes (Tr. pp. 48-49, 267-270, 302-303).

In September 2009, Dr. Brouillette diagnosed Smith with bronchitis and prescribed a Z-Pak (Tr. p. 295).

In October 2009, Smith was admitted to the Avoyelles Hospital emergency room for complaints of chest pain radiating to her back on the left (Tr. p. 31). Smith reported a history of panic attacks, hypertension, hyperlipidemia, chronic anxiety, depression and back pain (Tr. p. 31). Smith also reported smoking about a pack of cigarettes per day and having been treated for bronchitis and coughing about two weeks earlier (Tr. p. 31). Smith was diagnosed with non-cardiac chest pain, acute bronchitis, and chronic obstructive pulmonary disease, and prescribed cortical steroids and a low-dose of Xanax (Tr. p. 30).

Also in October 2009, Dr. Brouillette diagnosed Smith with

6

hypertension under fair control, hypercholesterolemia, COPD, neck pain, and anxiety disorder (stable), continued her medications, and advised Smith to stop smoking (Tr. p. 294).   In November 2009, Dr. Brouillette noted Smith's flare-up of neck pain radiating to both shoulders, and prescribed a Medrol Dosepak and Flexeril, as well as Cymbalta for her depression (Tr. p. 293).

In February 2010, Smith was prescribed Robaxin for neck pain (Tr. p. 292).

In April 2010, Dr. Brouillette treated Smith for bronchitis (Tr. p. 341) and back pain (Tr. p. 340).   Later in April 2010, Smith was treated at the LSU Health Sciences Center emergency room for chronic back pain and dark urine; Smith had increased white blood cells, was diagnosed with sciatica and leukocytosis, and was prescribed a trial of antibiotics (Tr. pp. 359-365).

In August 2010, Dr. Brouillette prescribed Vicodin for Smith's back pain, executed a pain treatment agreement with her, and began her urine screening (Tr. p. 339).   In September 2010, Smith went to the LSU Health Sciences Center emergency room for back pain; she was diagnosed with sciatica and sent home with a Medrol dose pack (Tr. pp. 352-355).   Smith also went to the Avoyelles Hospital emergency room on September 2010 for back pain after lifting something heavy; she was diagnosed with chronic back pain, diarrhea, and anxiety (Tr. pp. 410-414).   In November 2010, Smith had a check up with Dr. Brouillette for her back pain and underwent another urine drug screen (Tr. p. 338).   Smith was also prescribed Xanax for her anxiety disorder (Tr. p. 338).

7

In December 2010, Smith was evaluated by Dr. Harar Yusuf, an internist, for her chronic back pain (six years) (Tr. p. 306). Dr. Yusuf noted Smith's report that her back pain was 8/10 and that she has had neck pain for seven years that is 6/10 (Tr. p. 306). Smith reported her neck pain radiates to her shoulders and arms bilaterally, and also complained of bilateral knee and ankle pain and past left foot stress fracture (Tr. p. 306). Dr. Yusuf further noted that Smith is married, has smoked a pack of cigarettes a day since she was fifteen years old, is dependent on others to drive a car, prepare meals and manage of money, and requires assistance with grooming, looking up telephone numbers, shopping for food and clothes, and housework (Tr. p. 307). Smith was 5'9" tall, weighed 194.4 pounds, and her blood pressure was 118/84 (Tr. p. 307). Dr. Yusuf also noted that Smith has a decreased range of motion in her lungs (Tr. p. 308). Dr. Yusuf diagnosed cervical radiculopathy, lumbar radiculopathy, hypertension, chronic obstructive pulmonary disease, hyperlipidemia and anxiety (Tr. p. 308). Dr. Yusuf further stated that Smith appeared to be depressed and had a decreased range of motion in her neck and lumbar area, but should be able to sit and stand, pull and push, kneel, crawl, crouch, reach, grasp, handle, and finger objects, and does not need an assistive device (Tr. p. 309). A radiology report in December 2010 of multiple views of Smith's left foot showed degenerative changes but no evidence of acute fracture or dislocation and Smith's soft tissues were within normal limits (Tr. p. 311).

In February 2011, Dr. Rick Adams, a clinical psychologist,

conducted a mental status exam on Smith (Tr. p. 314).  Smith reported that she lives with her husband and three children, washes dishes and clothes, her husband gets the clothes out of the dryer, she bathes and dresses, her husband does the cooking, she does not drive any more due to pain and fear, she mainly associates with her family, she is shy, and she does not engage in arguments (Tr. p. 351).  Smith also reported difficulty sleeping and worsening anxiety attacks (Tr. p. 315).  Dr. Adams stated that Smith does not appear to be limited in work due to psychological factors despite her nervousness around other people; Dr. Adams found that Smith's concentration, persistence and pace were not problems, but nervousness affected her memory and concentration (Tr. p. 316). Dr. Adams stated that Smith is likely able to understand, remember, and follow simple instructions with occasional forgetting when she is under conditions of higher anxiety, and that detailed instructions may prove more problematic for her (Tr. p. 316).  Dr. Adams diagnosed anxiety disorder NOS at Axis I[1] (Tr. p. 316).

In February 2011, Smith went to the Avoyelles Hospital emergency room with complaints of coughing for one week and pain on the left side when breathing (Tr. p. 404); however, she was not in respiratory distress and her breath sounded normal (Tr. pp. 404-

---

[1] The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client.  Axis I refers to clinical syndromes, Axis II to developmental disorders and personality disorders, Axis III to physical disorders and conditions, Axis IV to psychosocial stressors, and Axis V to the global (overall) assessment of functioning.  Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-35 (4th ed. 2000) ("DSM-IV-TR").

405).   Chest  x-rays  showed  COPD  (Tr.  pp.  405,  432).   Dr. Brouillette continued Smith's bronchitis treatment (Tr. p. 337).

Right  foot  x-rays  in  March  2011  showed  no  fractures  or significant  arthritic  changes,  but  x-rays  in  June  showed abnormalities probably representing chronic stress injuries (Tr. pp. 430-431).   In March 2011, Dr. Brouillette examined Smith for chronic back pain which Lortab was not controlling, as well as stiffness in her joints, mainly the knees and ankles (Tr. p. 336). Dr. Brouillette diagnosed hypertension under fair control (her blood pressure was 152/88), hypercholesterolemia, low back pain, and arthritis, and prescribed Diovan, continued Lipitor and Ziac, discontinued Lortab, and prescribed Percocet instead (Tr. p. 336).

In June 2011, Smith went to the Avoyelles Hospital emergency room for right foot pain and swelling which was treated with an ice pack (Tr. pp. 398-401); the clinical impression was a closed, non-displaced fracture of the fourth or fifth metatarsal (Tr. pp. 399, 499).   In July 2011, Smith had x-rays of left and right foot stress fractures, for which she reported having right foot pain beginning in June but denied any injury (Tr. pp. 346-351, 375-377, 491-494). A bone density test in August 2011 was normal (Tr. p. 498).

In August 2011, Smith was evaluated at the Avoyelles Mental Health Clinic and diagnosed with major depression and anxiety; her GAF was 65-70[2] (Tr. pp. 381-384.  Smith was prescribed Cymbalta and

---

[2] The Global Assessment of Functioning, or GAF, score represents Axis V of the Multiaxial Assessment system.  The axial system of evaluation enables the clinician to comprehensively and

Hydroxyzine (Tr. pp. 382-384).

In October 2011, Smith was again diagnosed with and treated for acute bronchitis (Tr. pp. 487-490).

In November 2011, Smith complained of back pain that radiated down both legs (Tr. pp. 479-486); an MRI of Smith's lumbar spine showed degenerative disc and facet disease without spinal stenosis and mild foraminal narrowing at L3-4, L4-5, and L5-S1 (Tr. p. 497). Smith was diagnosed with lumbago and prescribed Percocet and Zanaflex (Tr. p. 482).

In December 2011, Smith returned to the Avoyelles Hospital emergency room with complaints of right foot pain (Tr. pp. 393-396). X-rays showed a non-united fracture of the right fifth metatarsal of Smith's right foot and a possible second injury (Tr. p. 428). Smith was prescribed Toradol and instructed to wear her walking boot (Tr. p. 396). Later in December, Smith was treated by Dr. Brouillette for anxiety and back pain, and prescribed hydrocodone-acetaminophen and Alprazolam (Tr. pp. 475-478).

In February and March, Smith reported right shoulder pain radiating to the right arm with tingling sensation; Dr. Brouillette found right shoulder tenderness and a limited range of motion, and

---

systematically evaluate a client. Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-30 (4th ed. 2000) ("DSM-IV-TR"). GAF is a standard measurement of an individual's overall functioning level. The GAF score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning with respect to psychological, social and occupational functioning, on a hypothetical continuum of mental health-illness. A GAF of 61-70 indicates some mild symptoms OR some difficulty in social, occupational or school functioning, but is generally functioning pretty well and has some meaningful interpersonal relationships.

advised her to avoid heavy lifting and strenuous exercise (Tr. pp. 467-474).

In March 2012, Dr. Brouillette prescribed Celexa to treat Smith's depression (Tr. pp. 463-466).  In April and May 2012, Smith was treated by Dr. Brouillette for anxiety, back pain, cough, congestion and fever; Dr. Brouillette diagnosed anxiety, lumbago, and acute bronchitis, and prescribed Alprazolam, Percocet, Levaquin, Promethazine, and Methylprednisolone, and continued her inhalers (Tr. pp.  450-462, 495-496).

In June 2012, Dr. Brouillette examined Smith, noted she was 5'6" tall, weighed 187 pounds, her blood pressure was 122/80 and diagnosed essential hypertension, anxiety, lumbago and obstructive chronic bronchitis without exacerbation (Tr. pp. 445-449).  Smith was instructed as to diet and exercise, advised to avoid heavy lifting, and prescribed Bisoprolol, Alprazolam, Vicodin, and a nebulizer and compressor (Tr. p. 448).

In July 2012, Smith was treated by Dr. Brouillette for complaints of back and leg pain and anxiety (Tr. pp. 436-438). Smith's back was tender on flexion and extension, she was diagnosed with lumbago and anxiety, and prescribed Mobic, Vicodin, and Alprazolam (Tr. p. 439).

2. 2011 Administrative Hearing

At her October 2011 administrative hearing, Smith testified that she completed tenth grade, does not have a GED, and attended vocational-technical school to be a CNA (Tr. p. 61).  Smith further testified that she last worked in about 2001 at the Oak Haven

Nursing Facility; she worked there full time as a housekeeper (Tr. pp. 61-62).  Smith testified that Oak Haven is the only place she worked in the last fifteen years, and that she worked there for six to eight months (Tr. p. 62).

Smith testified that, in 2009 or 2010, a doctor (neurosurgeon) at the LSU Medical Center in Shreveport offered her neck surgery as an option (Tr. p. 63).  Smith testified that her problems are in her neck and from the middle of her back to her tail bone (Tr. p. 63).  Smith testified that Dr. Brouillette treats her back problems, anxiety, colds, COPD, and emphysema (Tr. p. 63).  Smith testified that she currently takes Spiriva, ProAir, Cymbalta, Xanax, Bisoprolol, Diovan, Lortab, and Lipitor (Tr. p. 64).  Smith testified that she takes Lortab three times a day, and that it makes her tired for two and a half to three hours, starting about thirty minutes after she takes it, and affects her ability to concentrate (Tr. pp. 84-85).

Smith testified that her neck problems cause numbing sensations in her neck on both sides that go down her arms; that occurs at least twice a day, about five days a week (Tr. p. 64).  Smith testified that the numbness in her arms causes her to drop things and have difficulty picking things up and using her hands (Tr. pp. 64-65).  Smith testified that she no longer drives (Tr. p. 65).  Smith testified that she was diagnosed with carpal tunnel syndrome about six years ago (Tr. p. 65) and that she underwent a series of injections in both wrists (Tr. p. 66).

Smith further testified that the neurosurgeon in Shreveport

told her she is not a surgery candidate for her lower back, yet (Tr. p. 66).   Smith testified that, five days a week, her lower back hurts so badly that she has difficulty walking and her husband has to assist her in the bathroom (Tr. p. 66).   Smith testified that her feet and legs go numb from her lower back to the bottoms of her feet; the numbness occurs if she sits or stands or walks too long (Tr. pp. 66–67).   Smith testified that she has to lie on her right side all night; otherwise she gets numb and has very bad pain (Tr. p. 67).   Smith testified that the pinched nerve in her neck causes numbness in her left arm and the pinched nerve in her lower back causes numbness in her left leg (Tr. p. 67).

Smith testified that she was diagnosed with COPD in February 2010, when she went to the hospital for an anxiety attack; she takes Spiriva and ProAir for her COPD (Tr. p. 68).   Smith testified her COPS is aggravated by smoking cigarettes and by not having the air conditioner on (Tr. p. 68).   Smith testified that she used to smoke two packs of cigarettes a day, but now only smokes fifteen cigarettes a day (Tr. p. 68).

Smith testified that she has taken medication for hypertension for seven or eight years, and recently added another medication to her regimen because her blood pressure was getting higher (Tr. p. 69).   Smith testified that she takes her blood pressure medication every day; when her blood pressure goes up, her head and chest hurt (Tr. p. 69).

Smith further testified that she recently started going to the Avoyelles Mental Health Clinic for anxiety and depression, for

which she is taking Cymbalta and hydroxyzine (Tr. pp. 70-71). Smith also receives counseling (Tr. p. 71). Smith testified that her mental health problems started due to her physical health problems (Tr. p. 71). Smith testified that she used to be able to mow the grass, garden, and play with her children outside, but that changed six or seven years ago and it has gotten worse; Smith's physical problems have caused her to be depressed (Tr. p. 79). Smith testified that, now, her children help her with her work (Tr. p. 71). Smith testified she needs assistance due to both physical and mental problems because she has difficulty doing something and completing it (Tr. p. 71).

Smith testified that she can sit and watch television for ten to fifteen minutes, then has to walk around because she starts hurting (Tr. p. 72). Smith testified that she does not socialize with people outside of her family due to shyness, and does not like to be around other people (Tr. p. 72). Smith testified that she lives with her husband and three children (ages 17, 13 and 11) in a mobile home (Tr. p. 73). Smith testified that her husband is a carpenter who is out of work a lot (Tr. p. 73). Smith testified that, when her husband is at work and the children are at school, she is able to stay home by herself (Tr. p. 73). Smith also testified that her husband does all of the cooking, but she is able to use the microwave and can assist in preparing food (Tr. pp. 73-74). Smith testified that she washes dishes and cleans the kitchen, but it takes her a while to complete because she cannot stand at the sink very long (Tr. p. 74). Smith testified that,

when she gets tired of standing up, she has to sit down and rest a while (Tr. p. 74).  Smith testified that she is able to do a little housework on a good day, but is unable to do any housework on a bad day, when she has too much pain or is too depressed (Tr. p. 830. Smith testified that she has six to ten bad days a month (Tr. p. 830.

Smith testified that she does not drive anymore (not since 2000) and no longer has a driver's license because she cannot turn her neck to see over her shoulder and she is too nervous; her mother or her husband drive her around (Tr. p. 74).  Smith testified that she goes to the grocery store, doctor appointments, her children's schools, and church (Tr. p. 75).  Smith testified that she tries to see Dr. Brouillette at least once a month, but she may not go if she gets too depressed (Tr. p. 75).

Smith testified that she has anxiety attacks about once every two weeks (Tr. p. 75).  Smith testified that Dr. Brouillette prescribed Xanax, but that she is unable to take it since the Mental Health Unit prescribed hydroxyzine; the two medications are not compatible (Tr. p. 76).  Smith testified that the hydroxyzine seems to be working better (Tr. p. 76).  Smith also testified that she does not sleep well; she wakes up two or three times at night and snores when she sleeps (Tr. p. 76).

Smith testified that she is able to follow instructions (Tr. pp. 76-77).  Smith also testified that she can walk for ten to fifteen minutes before she has to sit and rest for ten to fifteen minutes (Tr. pp. 77, 81).  Smith testified that she can sit for ten

16

to fifteen minutes, then she has to sit down for about ten minutes (Tr. p. 81).   Smith testified that she can stand for about ten minutes at a time (Tr. p. 81).   Smith testified that the most strenuous activity she does during the week is folding clothes, due to the weight of the clothes and having to stand and move her arms and hands (Tr. pp. 77-78).   Smith testified that she is right handed, that lifting things gives her problems with her hands, and holding cups and glasses or picking up plates makes her fingers hurt (Tr. p. 81).   Smith testified that she has trouble picking up small objects with either hand, and that it hurts either hand to grip and turn faucets (Tr. p. 82).   Smith testified that turning her neck to the right is difficult; it stiffens and pinches (Tr. p. 82).   Smith can look down for about thirty seconds before she has to lift her head for about two minutes (Tr. p. 82).

Smith testified that her medications work pretty well, but they make her tired every day; Smith testified that she stays awake during the day so she can sleep at night (Tr. p. 78).   Smith testified that the Mental Health Unit told her that hydroxyzine will help her sleep better, although it would take a while for it to work (Tr. p. 78).

Smith testified that she had been to the emergency room for bronchitis and for a right foot fracture in the past year (Tr. p. 85).   Smith testified her left foot was fractured two years previously (Tr. p. 86).   Smith testified that her feet have had stress fractures, but there are no problems with her bone density (Tr. p. 86).

17

Smith testified that she wants to feel better and get job training (Tr. pp. 83-84).  Smith testified that she has not been doing anything in the last ten years (Tr. p. 84).

The VE testified that Smith's past work as a CNA (certified nurse assistant) was medium level work, SVP 4, and DOT 355-674.014,[3] and that her past work as a housekeeper/cleaner was light work, SVP 2, and DOT 323.687-014 (Tr. p. 87).

The ALJ posed a hypothetical involving a person of Smith's age and education, who can perform no more than light work, cannot climb ropes, ladders or scaffolds, can occasionally climb ramps and stairs, can occasionally balance, stoop, kneel, crouch, and crawl, should avoid unprotected heights, dangerous moving machinery, and concentrated exposure to dust, fumes, gases and other pulmonary irritants, can frequently operate foot pedals bilaterally, and can handle and finger bilaterally (Tr. p. 88).  The VE testified that such a person could do her past relevant work as a housekeeper/cleaner (Tr. p. 88).

The ALJ posed a second hypothetical involving a claimant with the same limitations and abilities as the first, with the additional limitations that she could only perform jobs that require one to three step instructions, cannot do production rate or pace work, and can have only occasional interaction with the public, coworkers and supervisors.  The VE testified that such a person could do her past work as a housekeeper/cleaner (Tr. p. 88).

_____

[3] Dictionary of Occupational Titles, published by the Department of Labor.  See 20 CFR § 404.1566.

The ALJ posed a third hypothetical involving a claimant with the same limitations and abilities as in the second hypothetical, with the additional limitation that the person can only *frequently* rotate, extend or flex her neck down, up, and to the right, but does not have any restrictions on rotating to the left (Tr. p. 88). The VE testified that such a person could do her past work as a housekeeper/cleaner (Tr. p. 88).

The ALJ posed a fourth hypothetical involving a claimant with the same limitations and abilities as in the second hypothetical, with the additional limitation that the person can only *occasionally* rotate, extend or flex her neck down, up, and to the right, but does not have any restrictions on rotating to the left (Tr. p. 88). The VE testified that such a person cannot do any of her past relevant work (Tr. pp. 88-89). The VE further testified that such a person could do light level work as a ticket-taker (light, SVP 2, DOT 344.677-010, 107,000 jobs in the nation and 900 jobs in Louisiana, SOC[4] 393031) (Tr. pp. 89, 92-93). The VE explained that a ticket taker does not actually interact with the public because she only takes a ticket out of a person's hand and tears off a stub (Tr. p. 91). The VE stated that, although a ticket taker is in proximity to the public, she does not deal with the public (Tr. p. 91). The VE further stated that a ticket taker

---

[4] The Standard Occupational Classification ("SOC") system is used by federal statistical agencies to classify workers into occupation categories for the purpose of collecting, calculating, or disseminating data. United States Department of Labor, Bureau of Labor Statistics, Standard Occupational Classification, at http://www.bls.gov/soc/.

would work at a theater or a sporting event (Tr. p. 92).  The VE explained that five DOT job titles (including ticket taker) are embodied within the SOC code, but that he had not considered the other jobs (Tr. p. 93).

The ALJ posed a fifth hypothetical involving a claimant with the same limitations and abilities as in the fourth hypothetical, but with the additional restriction that she can only occasionally handle and finger bilaterally (Tr. p. 89).  The VE testified that such a person would not be able to work as a ticket taker or do any other light work (Tr. p. 89).

The ALJ posed a sixth hypothetical involving a claimant who can do no more than sedentary level work, must avoid hazards such as dangerous moving machinery, unprotected heights, and concentrated exposure to gases, fumes and other pulmonary irritants, can only frequently operate foot pedals bilaterally, can only frequently handle and finger things bilaterally, is limited to one to three step instructions, cannot do production rate or pace work, and can only occasionally interact with the public, coworkers and supervisors (Tr. pp. 89-90).  The VE testified that such a person could do sedentary work as an addresser (sedentary, SVP 2, DOT 209.587-010, 139,000 jobs nationally and 2000 jobs in Louisiana, SOC 439022) (Tr. pp. 90, 93).  The VE explained that the job numbers he cited were for the entire SOC code (439022), which includes seven jobs, all sedentary, one of which is addresser (Tr. pp. 93-94).  The VE further explained that he did not now whether Smith would be able to perform the other jobs within that SOC code

because he had not considered them (Tr. p. 94).

The ALJ posed a seventh hypothetical involving a claimant with the same limitations and abilities set forth in the sixth hypothetical, but with the additional limitation of only frequently rotating, extending and flexing her neck down and to the right (no restrictions to the left) (Tr. p. 90).  The VE testified that such a person can work as an addresser (Tr. p. 90).

The ALJ posed an eighth hypothetical involving a claimant with the same limitations and abilities set forth in the seventh hypothetical, but who can only occasionally handle and finger and can only occasionally rotate and extend her neck down and to the right (Tr. p. 90).  The VE testified that such a person would not be able to work as an addresser (Tr. p. 90).

<u>ALJ's Findings</u>

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a).  The sequential process required the ALJ to determine whether Smith (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236

21

(5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984 (1995),
citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial
burden of showing that she is disabled.  Under the regulations,
this means that the claimant bears the burden of proof on the first
four steps of the sequential analysis.  Once this initial burden is
satisfied, the Commissioner bears the burden of establishing that
the claimant is capable of performing work in the national economy.
Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Smith has not engaged
in substantial gainful activity since August 26, 2010 (Tr. p. 16),
and that she has severe impairments of degenerative disc disease of
the cervical and lumbar spine with cervical radiculopathy and
carpal tunnel syndrome, arthritis in the left foot (status post
healed left foot fracture), chronic obstructive pulmonary disease,
hypertension, and depression, but that she does not have an
impairment or combination of impairments listed in or medically
equal to one listed in Appendix 1 (Tr. p. 16).  The ALJ also found
that Smith is unable to perform her past relevant work (Tr. p. 23).

At Step No. 5 of the sequential process, the ALJ further found
that Smith has the residual functional capacity to perform the full
range of sedentary except that she should avoid hazards such as
dangerous moving machinery, unprotected heights and concentrated
exposure to gases, fumes, smoke and other pulmonary irritants, she
can only frequently operate foot pedals bilaterally, can only
frequently extend and rotate her neck to the right (with no

restriction to the left), can only frequently handle and finger with her hands bilaterally, is limited to 1-2-3 step instructions with no production rate or pace work, and she can have only occasional interaction with the public, co-workers and supervisors (Tr. pp. 19-20). The ALJ found that Smith is a younger individual with a limited education and that transferability of job skills was not an issue because Smith's past relevant work was unskilled (Tr. p. 23). The ALJ concluded there are a significant number of jobs in the national economy which Smith can perform, such as addresser and, therefore, Smith was not under a "disability" as defined in the Social Security Act at any time through the date of the ALJ's decision on January 6, 2012 (Tr. pp. 23-24).

<u>Scope of Review</u>

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. <u>McQueen v. Apfel</u>, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. <u>Falco v. Shalala</u>, 27 F.3d 160, 162 (5th Cir. 1994), citing <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a

scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981). Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. Dellolio, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

## Law and Analysis

### Issues 1-2 - Mental Residual Functional Capacity & the Hypothetical

Smith argues that the ALJ declined to adopt the mental restrictions assessed by Dr. Spurrier, but she adopted a mental residual functional capacity which is not reflective of the

assessment by Dr. Adams, the source on whom she intended to rely.[5]

Smith contends that no evidentiary choices support the ALJ's finding, and that the mental residual functional capacity adopted by the ALJ is less restrictive than any of the mental health sources in the record. Smith further argues that the ALJ's hypotheticals to the VE are deficient because they did not accurately depict the established restrictions. Since the VE's testimony was based on a defective hypothetical, substantial evidence does not support the Commissioner's conclusion that Smith can work as an addresser.

The ALJ stated that she gave significant weight to Dr. Adams' consultative evaluation (Tr. p. 23):

> "Dr. Adams concluded in February 2011 that the claimant had no problems with concentration, persistence, and pace but did have memory problems after a delay, which the claimant stated was due to being nervous. He opined that the claimant was able to understand, remember, and follow simple instructions. Dr. Yusuf opined in December 2010 that the claimant was capable of performing sitting, standing, pushing, pulling, kneeling, crawling, crouching, reaching, grasping, handling, and fingering of objects. The opinions of these physicians are considered to be consistent with the treating source records and objective medical findings."

Dr. Adams, a clinical psychologist, stated that Smith does not

_____

[5] The undersigned has not considered the opinion of Jack Spurrier, Ed.D. as to Smith's mental limitations (Tr. pp. 102-109). Spurrier is not a psychologist, psychiatrist, or a Louisiana licensed vocational rehabilitation counselor; he is a doctor of education. Therefore, Spurrier is not qualified to give an expert opinion as to Smith's mental limitations. See La.C.E. art. 702. Moreover, Spurrier was a consultant who reviewed Smith's health records to form his opinion as to her functional limitations at the initial disability determination level and did not evaluate Smith in person (Tr. pp. 102-103, 106-109).

appear to be limited in work due to psychological factors despite her nervousness around other people, and found that Smith's concentration, persistence and pace are not problems, but that nervousness affects her memory and concentration (Tr. p. 316). Dr. Adams also stated that Smith is likely able to understand, remember, and follow simple instructions with occasional forgetting when she is under conditions of higher anxiety, and detailed instructions may prove more problematic for her (Tr. p. 316). Dr. Adams diagnosed anxiety disorder NOS at Axis I[6] (Tr. p. 316).

Smith contends the ALJ failed to include Dr. Adams' finding that Smith's job performance would be "significantly affected" by her mental problems, she has difficulty with tasks which involve memory after a delay, and has a presumptive inability to concentrate. Dr. Adams stated that being around other people (not family) makes Smith anxious and her performance seems to be affected significantly when she is "nervous," and found that Smith's concentration, persistence and pace are not problems, although nervousness affects her memory and concentration (Tr. p. 316). Dr. Adams also stated that Smith is likely able to understand, remember, and follow simple instructions with occasional forgetting when she is under conditions of higher

---

[6] The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. Axis I refers to clinical syndromes, Axis II to developmental disorders and personality disorders, Axis III to physical disorders and conditions, Axis IV to psychosocial stressors, and Axis V to the global (overall) assessment of functioning. Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-35 (4th ed. 2000) ("DSM-IV-TR").

anxiety, and detailed instructions may prove more problematic for
her (Tr. p. 316).  Clearly, Dr. Adams found that Smith's ability to
work was affected by the nervousness caused by being around people
who are not her family, and described the effects her nervousness
had on her ability to work.

Contrary to Smith's argument, the ALJ's finding that Smith can
only occasionally interact with the public, coworkers and
supervisors incorporates Dr. Adams' conclusions regarding Smith's
limited ability to be around people other than her family, due to
nervousness which causes memory and concentration problems.

The ALJ also incorporated the limitation of only occasional
interaction with the public, coworkers and supervisors into her
hypothetical to the VE, thereby implicitly including the effects
that Smith's nervousness around other people has on her ability to
work (memory and concentration problems).   Therefore, the
hypothetical was not defective in this respect.

Since the ALJ's finding, that Smith's nervousness around
people affects her ability to work, is compatible with Dr. Adams'
findings, and the ALJ included Smith's limited ability to be around
other people (and thereby her nervousness and its effects on her
ability to work) in her hypothetical to the VE, substantial
evidence supports the ALJ's conclusion that Smith can perform work
despite her limited ability to be around other people.

These grounds for relief are meritless.

Issue 3 - Numbers of Jobs

Finally, Smith argues that, even if the hypothetical had been

adequate, the vocational expert admitted that he did not know how many of the numbers of jobs cited were actually consistent with the ALJ's assumptions.  Smith's argument is based on the fact that the ALJ did not know the number of addresser jobs that exist in the national and regional economies because he relied on the Standard Occupational Classification ("SOC") system instead of the Dictionary of Occupational Titles ("DOT").

At Step Five of the sequential analysis, the Commissioner bears the burden of establishing that the claimant is capable of performing work existing in significant numbers in the national economy.  The Social Security Act, 42 U.S.C. §423(d)(2)(A) provides that "'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several other regions of the country.  It does not matter whether – (1) Work exists in the immediate area in which you live; (2) A specific job vacancy exists for you; or (3) You would be hired if you applied for work."  Section 404.1566(b) further states:

> "Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications.  Isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered 'work which exists in the national economy.'"

Vocational experts' use of government publications in finding jobs which a claimant can perform was explained in Brault v. Social Sec. Admin., Com'r, 683 F.3d 443, 446 (2d Cir. 2012):

> "The Dictionary of Occupational Titles (the 'DOT') is a

United States Department of Labor publication.  The DOT gives a job type a specific code—for example, '295.467-026 Automobile Rental Clerk'—and establishes, among other things, the minimum skill level and physical exertion capacity required to perform that job. Because of the detailed information appended to each DOT code, the codes are useful for determining the type of work a disability applicant can perform. In fact, the DOT is so valued that a VE whose evidence conflicts with the DOT must provide a 'reasonable explanation' to the ALJ for the conflict. See Social Security Ruling (SSR) 00-4p, Policy Interpretation Ruling: Titles II and XVI: Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions, 2000 WL 1898704 (Dec. 4, 2000).  The DOT, however, just defines jobs. It does not report how many such jobs are available in the economy."

In Brault, 683 F.3d at 446, the VE relied on the Occupational Employment Quarterly II (the "OEQ"), prepared by a private organization called U.S. Publishing, to assess whether positions existed for each of the DOT codes at issue, both in the national and state economies.  The court discussed the problems with data aggregation between the SOC and the DOT, Brault, 683 F.3d at 446-447:

"...[The] Standard Occupational Classification System ("SOC") code, [is] a new system the Bureau of Labor Statistics has embraced to replace the DOT code regime. SOC codes, however, are not useful for disability proceedings because they do not contain the same detailed occupational information as DOT codes. Thus a VE must use some method for associating SOC-based employment numbers to [sic] DOT-based job types.

"But [Brault] stumbled onto a classic academic problem with data aggregation—a many-to-one mapping, such as the one the VE used to associate DOT titles to SOC codes, necessarily creates information loss. See generally Guy H. Orcutt, et al., Data Aggregation and Information Loss, 58 Am. Econ. Rev. 773 (1968); Margaret St. Pierre & William P. LaPlant, Jr., Issues in Crosswalking Content Metadata Standards (National Information Standards Organization White Paper, 1998). If, for example, ten DOT codes map to a single SOC code, saying there are 100,000 total positions available in that SOC code gives no

information at all about how many positions each of the ten DOT codes contributed to that total. This becomes a problem if DOT titles with different exertion or skill levels map to the same SOC code. In such a situation, the OEQ apparently uses a rough weighted average algorithm—if ten DOT codes correspond to one SOC code, and four of those codes are light-duty, unskilled positions, then the OEQ will list 40% of the positions available in that SOC as light-duty, unskilled positions. That estimate may deviate significantly from the actual number of existing positions."

This is the problem pointed out by Smith in her case.  The VE gave the number of jobs both nationally and in Louisiana for the entire SOC code 439022: 139,000 jobs nationally and 2000 jobs in Louisiana (he did not give the source of those numbers) (Tr. pp. 90, 93).  On cross-examination by Smith, the VE explained that the entire SOC code 439022 includes seven jobs, all of which are sedentary and one of which is the addresser job (Tr. pp. 93-94). The VE further explained that he did not know whether Smith would be able to perform the other jobs within that SOC code, given her impairments and limitations (Tr. p. 94).  Since Smith cannot perform the full range of sedentary work, she cannot necessarily perform all seven jobs, and the ALJ did not consider the other six jobs.

As pointed out by Smith, the VE in her case never gave the number of jobs for the job of addresser only and did not testify based on his experience as to whether the job of addresser exists in significant numbers; he simply gave the numbers for the SOC category that is comprised of seven different jobs.  There is no evidence that shows there are a significant number of addresser jobs in the national or regional economies.  Compare Fuller v.

<u>Astrue</u>, 2009 WL 50017 (N.D.Tex. 2009); <u>Bagwell v. Barnhart</u>, 338 F.Supp.2d 723 (S.D.Tex. 2004).   Therefore, substantial evidence does not support the ALJ's/Commissioner's conclusion that work exists in significant numbers in the national or regional economies which Smith can do.

Since substantial evidence does not support the conclusions of the ALJ and the Appeals Council, their decision is incorrect as a matter of law.   However, this does not entitle Smith to a decision in her favor based upon the existing record.   The record is simply inconclusive as to whether there are any jobs existing in sufficient numbers in the national or regional economies which Smith can perform, given her impairments.   Therefore, Smith's case should be remanded to the Commissioner for further proceedings.

Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be VACATED and that Smith' case be REMANDED to the Commissioner for further proceedings.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.   A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.   A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.   Timely objections will be considered by the district judge before he makes a final ruling.

31

A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN fourteen(14) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.

THUS DONE AND SIGNED at Alexandria, Louisiana, on this day of March 2014.

                                        JAMES D. KIRK
                            UNITED STATES MAGISTRATE JUDGE